**UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF FLORIDA
TALLAHASSEE DIVISION**

---

|  |  |
|---|---|
| | Case No.  4:13-CV-431 |
| MASTER SCREENS, INC.,  and | JURY TRIAL DEMANDED |
| DANIEL PRICE BART, as | |
| direct and indirect aluminum purchasers, | |
| individually and on behalf of all companies | |
| and persons similarly situated, | |
| | |
| *Plaintiffs,* | |
| -v- | |
| | |
| GOLDMAN SACHS SACHS GROUP, INC., | |
| METRO INTERNATIONAL TRADE | |
| SERVICES, GLENCORE XSTRATA, INC., | |
| HENRY BATH, LLC, HENRY BATH & SON | |
| LTD., JP MORGAN CHASE & CO., THE | |
| LONDON METAL EXCHANGE, | |
| GS POWER HOLDINGS, LLC, | |
| and related cartel and collusive parties, | |
| | |
| *Defendants*. | |

---

**ANTI-TRUST AND RACKATEERING COMPLAINT FOR DAMAGES AND
EQUITABLE RELIEF**

**INTRODUCTION**

1.      Plaintiffs MASTER SCREENS, INC., DANIEL PRICE BART, et al., ("Direct and

Indirect Purchaser Plaintiffs"), individually, and on behalf of all persons similarly situated in the

United States (the "Proposed Class"), hereby bring this instant class action against GOLDMAN

SACHS GROUP, INC., METRO INTERNATIONAL TRADE SERVICES, GLENCORE

XSTRATA, INC., HENRY BATH, LLC, HENRY BATH & SON LTD., JP MORGAN CHASE

& CO., THE LONDON METAL EXCHANGE, GS POWER HOLDINGS, LLC  and related co-

conspirators (collectively, "Defendants"), to obtain injunctive relief, to be compensated for economic damages they suffered as a result of directly and indirectly purchasing price inflated aluminum premiums including the Midwest Premium, Plats MW Midwest Premium or Midwest Transaction Premium Price, collectively referred to as the "Midwest Premium" (The Midwest Premium is a standard contract benchmark price term for purchasing and selling physical aluminum), from the collective Defendants' as a result of their deliberate and conspiratorial pattern of anti-trust cartel, collusive practices and racketeering activity to restrain trade from February 1, 2010 to the present.

2.      The Plaintiffs seek to be compensated for economic injuries they suffered as a result of Defendants' violations of the federal and state substantive laws cited herein as a result of the Defendants' conduct, for damages, declaratory and injunctive relief under sections 1 and 2 of the Sherman Act to restrain anticompetitive conduct of inefficiently restraining supply and inflating prices by Defendants, including GOLDMAN SACHS GROUP, INC., ("GOLDMAN SACHS"), one of the world's largest investment banking firm with nearly a trillion dollars in assets, and JP MORGAN CHASE ("JP MORGAN") with over two trillion dollars in assets.

3.      Plaintiffs seek to remedy the effects of Defendants' past unlawful conduct   pursuant to the Sherman Act, the Clayton Act, 15 U.S.C § 15, the Florida antitrust act, Chapter 542, Fla. Stat., *et seq*, and similar state laws from the 49 other states, the Florida unfair and deceptive acts and practices under Fla. Stat. § 501.201, *et seq,* and similar state laws from the other 49 states, brought on behalf of companies and individuals who directly and indirectly purchased aluminum during the monopolization, exclusive dealing, and essential facilities manipulation of the aluminum market through supply price fixing, market sharing, horizontal and vertical collusion and merger, and other collusive cartel practices through interstate and

international mail and wire communications by Defendants from 2010 through 2013.

4.      Florida Statutes permit both direct and indirect purchasers to bring antitrust actions.

Fla. Stat. § 542.22 provides in part:

"Any person who shall be injured in her or his business or property by reason of any violation of s. 542.18[1] or s. 542.19[2] may sue therefor in the circuit courts of this state and shall recover threefold the damages by her or him sustained, and the cost of suit, including a reasonable attorney's fee."

5.      The United States Supreme Court summarized why Congress authorized private antitrust

lawsuits in the case *Hawaii v. Standard Oil Co. of Cal.*, 405 U.S. 251, 262 (1972), which

reasoning applies directly to the case at hand:

> Every violation of the antitrust laws is a blow to the free-enterprise system envisaged by Congress. This system depends on strong competition for its health and vigor, and strong competition depends, in turn, on compliance with antitrust legislation. In enacting these laws, Congress had many means at its disposal to penalize violators. It could have, for example, required violators to compensate federal, state, and local governments for the estimated damage to their respective economies caused by the violations. But, this remedy was not selected. Instead, Congress chose to permit all persons to sue to recover three times their actual damages every time they were injured in their business or property by an antitrust violation. By offering potential litigants the prospect of a recovery in three times the amount of their damages, Congress encouraged these persons to serve as "private attorneys general."

## **PARTIES**

6.      Plaintiff MASTER SCREENS, INC., is, and at all times material was, a company doing

business in DUVAL County, 4411 Kelnepa Drive, Jacksonville, Florida, who purchased

aluminum products at inflated prices due to the anti-trust conspiracy of Defendants.

7.      Plaintiff, DANIEL PRICE BART, is a resident of Tallahassee, Florida, and purchaser of

---

[1] Fla. Stat. § 542.18   Restraint of trade or commerce.— Every contract, combination, or conspiracy in restraint of trade or commerce in this state is unlawful.
[2] Fla. Stat. § 542.19   Monopolization; attempts, combinations, or conspiracies to monopolize.— It is unlawful for any person to monopolize, attempt to monopolize, or combine or conspire with any other person or persons to monopolize any part of trade or commerce in this state.

beverages sold in aluminum cans.

8.      Defendant, GOLDMAN SACHS GROUP, INC., is, and at all times material was, a New York corporation with its principal place of business located at 200 West Street, New York, New York.

9.      Defendant, METRO INTERNATIONAL TRADE SERVICES, is a United States Company, a leading global metals warehouse operator, headquartered in 650 Middlebelt Road, Romulus, Michigan 48174.

10.      Defendant GLENCORE XSTRATA, is, and at all times material was an Anglo–Swiss multinational commodity trading and mining company headquartered in Baar, Switzerland and with its United States registered office in Saint Helier, Jersey. The company was created through a merger of Glencore with Xstrata on May 2, 2013.

11.      Defendant GLENCORE, at all times  material was an Anglo–Swiss multinational commodity trading and mining company headquartered in Baar, Switzerland and with its United States registered office in Saint Helier, Jersey.

12.      Defendant, XSTRATA plc, at all times material was an Anglo-Swiss multinational mining company headquartered in Zug, Switzerland and with its registered office in London, United Kingdom.

13.      Defendant, HENRY BATH, LLC, is a United States Company, world leading logistics provider specializing in the storage and shipping of exchange traded metals, and is the founding member of THE LONDON METAL EXCHANGE, headquartered in 2500-A Broening Highway, Baltimore, MD 21224.

14.      Defendant, HENRY BATH & SON, LTD., is a London Based company, and is the parent company presiding over the Baltimore, Singapore, and Rotterdam offices, headquartered in 12

Princes Parade, St. Nicholas Place, Liverpool L3 1BG, United Kingdom..

15.     Defendant, JP MORGAN CHASE & CO., is one of the oldest financial institutions in the

United States with assets of $2.4 trillion, operating in more than 60 countries, with 260,000

employees, and is a leader in investment banking, financial services for consumers, small

business and commercial banking, financial transaction processing, asset management and

private equity.

16.     Defendant, LONDON METAL EXCHANGE, is a London based company, responsible

for monitoring the metal commodities global markets.  The objective of The London Metal

Exchange ("LME") is to provide facilities, along with the management and regulatory structure,

for trading in **LME contracts**. It is a Recognized Investment Exchange (RIE), regulated directly

by the **Financial Conduct Authority** (FCA).  Although its activities are closely related to the

physical markets, it operates within the regulatory framework of the **Financial Services and**

**Markets Act 2000**.The Act closely defines the conditions under which the Exchange operates

and requires that as an RIE it maintains orderly markets in all it's contracts.  When it carries out

its activities in the United States (US), the Exchange is governed by the relevant US legislation

and by the Commodities and Futures Trading Commission (CFTC). It is also subject to any

relevant directives of the European Union.

17.     Defendant, GS POWER HOLDINGS, LLC, is a significant subsidiary of the GOLDMAN

SACHS GROUP, INC., and METRO INTERNATIONAL TRAD E SERVICES, LLC, operates

as a subsidiary of GS POWER HOLDINGS, LLC, and is a New York company located at 85

Broad Street, New York, NY 10004.


**JURISDICTION AND VENUE**

18.     Court has jurisdiction over this matter pursuant to Section 4 of the Sherman Act, 15

U.S.C. § 4, and 28 U.S.C. §§ 1331, 1337.

19.     Venue is proper in this District under Section 12 of the Clayton Act, 15 U.S.C. § 22, and

under 28 U.S.C. § 1391, because defendant transacts business and is found within this District.

## FACTUAL BACKGROUND

20.     In a rundown patch of Detroit, enclosed by a cyclone fence and barbed wire, stands an

unremarkable warehouse that investment bank GOLDMAN SACHS has transformed into a

money-making machine.

21.     The derelict neighborhood off Michigan Avenue in Detroit is a sharp contrast to

GOLDMAN SACHS's bustling skyscraper headquarters near Wall Street, but the two operations

share one important element: management by the bank's savvy financial professionals.

22.     A string of warehouses in Detroit, most of them operated by GOLDMAN SACHS, has

stockpiled more than a million tons of the industrial metal aluminum, about a quarter of global

reported inventories.

23.     Defendants, including GOLDMAN SACHS, have made a series of second level

agreements in restraint of trade.  In the second level agreements Defendants overbid other market

participants and further inflated aluminum prices as a means to attract and divert additional

aluminum to store in its warehouses. This is done through diversion agreements that include

incentive payments of $250 or more per ton, to firms to store aluminum for longer periods in

their LME warehouses.  This second level agreement has further inextricable intertwined the

injuries that Defendants have intentionally caused through their aluminum price inflation with

Defendants agreement to restrain aluminum supplies.  Defendants also created an inefficient load

out minimum on a per city rather than a per warehouse basis, creating inefficient feedback loops

for load out backlogs and longer storage times.  From 2009 to 2013, the amount of aluminum stored in non LME warehouses has declined by 50%, and the amount of aluminum trapped in LME warehouses has increased by more than 60%.

24.    Simply storing all that metal generates tens of millions of dollars in rental revenues for GOLDMAN SACHS every year.

25.    There's just one problem: much less aluminum is leaving the depots than arriving, creating an unreasonable restraint of trade and a supply pinch for manufacturers of everything from soft drink cans to aircraft.  The Midwest Premium price per pound of aluminum has increased from 6.1430 cents in February 2010, when the conspiracy began, to 12 cents per pound and higher in February of 2013.

26.    The resulting spike in prices has sparked a clash between companies forced to pay more for their aluminum and wait months for it to be delivered, GOLDMAN SACHS, which is keen to keep its cash machines humming and the London Metal Exchange (LME), the world's benchmark industrial metals market collude in this effort, through lax oversight by the LME.

27.    Analysts question why London's metals market allows big financial players like GOLDMAN SACHS to own the warehouses which store huge quantities of metal even as they trade the commodity. Robin Bhar, a veteran metals analyst at Credit Agricole in London says the conflict of interest is so acute he wants U.S. and European anti-trust regulators to weigh in.

28.    "I think it makes a mockery of the market. It's a shame," Bhar said. "This is an anti-competitive situation. It puts (some) companies at an advantage, and clearly the rest of the market at a disadvantage. It's a real, genuine concern. And I think the regulators have to look at it."

29.    GOLDMAN SACHS said its warehouse subsidiary METRO INTERNATIONAL TRADE

SERVICES has done nothing illegal, and abides by the LME's warehousing rules. "Producers have chosen to store metal in Detroit with Metro," a GOLDMAN SACHS spokeswoman said. "We follow the LME requirements in terms of storing and releasing metals from our warehouses."

30.    The London Metal Exchange defends its rules. "There is a perception that consumers have not been able to get to their metal when the reality is that it is big banks, financing companies and warehouses that are not able to get to their huge tonnages of metal fast enough," said LME business development manager Chris Evans.

31.    GOLDMAN SACHS' warehouse business relies on a lucrative opportunity enabled by the LME regulations. Those rules allow warehouses to release only a fraction of their inventories per day, much less than the metal that is regularly taken in for storage.

32.    30 Metro warehouses in Detroit took in 364,175 tons of aluminum and delivered out 171,350 tons. That represented 42 percent of inventory arrivals globally and 26 percent of the metal delivered out, according to the London Metal Exchange said.

33.    The metal that sits in the warehouse generates lucrative rental income.

34.    Little wonder that so many want in. Metro was acquired by GOLDMAN SACHS in February 2010, while commodities trading firm Trafigura nabbed UK-based NEMS in March 2010, and Swiss-based group Glencore International acquired the metals warehousing unit of Italy's Pacorini last September.

35.    Despite its rental income, GOLDMAN SACHS' warehouse strategy apparently hasn't been profitable enough and it has willfully created and is maintaining its anti-competitive monopoly power of 70% of the inventoried national market and 42% of the global inventoried market, to illegally extract wealth on a national and global scale amounting to approximately $5 billion

from the industry recognized, interchangeable and cross elastic aluminum commodities market in the United States, and abroad.

36.    The long delays in metal delivery have buyers fuming. Some consumers are waiting up to a year to receive the aluminum they need and that has resulted in the perverse situation of higher prices at a time when the world is awash in the metal.

37.    Defendants had knowledge of ongoing public complaints regarding inflated aluminum prices since early 2011.  Despite these complaints Defendants continued to restrain supply and inflate prices. Defendants had direct and indirect knowledge that they were inflating aluminum prices and injuring persons that paid those prices especially the Midwest Premium price.

38.    "It's driving up costs for the consumers in North America and it's not being driven up because there is a true shortage in the market. It's because of an issue of accessing metal ... in Detroit warehouses," said Nick Madden, chief procurement officer for Atlanta-based Novelis, which is owned by India's Hindalco Industries Ltd and is the world's biggest maker of rolled aluminum products. Novelis buys aluminum directly from producers but is still hit by the higher prices.

39.    Madden estimates that the U.S. benchmark physical aluminum price is $20 to $40 a ton higher because of the backlog at the Detroit warehouses. The physical price is currently around $280 per ton. That premium is forcing U.S. businesses to fork out millions of dollars more for the 6 million tons of aluminum they use annually.

40.    It has also had a knock-on impact on the global market, which is forecast to consume about 45 million tons of the lightweight, durable metal this year.

41.    Also pushing aluminum costs higher are bank financing deals, which are estimated to have locked up about 70 percent of the 4.4 million tons of the metal sitting in LME-registered

warehouses around the world. LME inventories hit an all-time record above 4.7 million tons in May.

42.    In a typical deal, a bank buys aluminum from a producer, agrees to sell it at some future point at a profit, and strikes a warehouse deal to store it cheaply for an extended time period.

43.    The combination of the financing deals and the metal trapped in Detroit depots, means only a fraction of the inventories are available to the market. Premiums for physical aluminum -- the amount paid above the LME's cash contract currently trading at $2,620 a ton -- in the U.S. Midwest hit a record high of $210 a ton in May, up about 50 percent from late last year. In Europe, the premium is at records above $200 a ton, double the levels seen in January 2010.

44.    The ripple effect into Asia has seen the premium paid in Japan increase 6 percent to $120 a ton in the third quarter from the previous quarter, the first rise in nearly six quarters.  The increased costs in aluminum by Defendants anti-competitive hoarding of aluminum impacts all tiers of direct and indirect purchasers, including but not limited to, extruders, distributors, contractors and end user consumers. Increased costs are either absorbed and/or passed on through the direct and indirect purchaser chain starting with the extruder, through the distributor, through the contractor, and to the end user consumer.

45.    GOLDMAN SACHS is storing the metal for other banks, traders and aluminum producers in a complex of warehouses outside Detroit that it acquired in 2010. The problem, as described in *The Times* by David Kocieniewski, is that since the bank entered this business, the time it takes buyers to get the metal from those warehouses has shot up to more than 16 months, from 6 weeks. GOLDMAN SACHS has attributed the delays to a shortage of trucks and forklift drivers. But GOLDMAN SACHS also pays incentives to owners of the metal to keep it in the bank's warehouses.

46.     Those delays have bolstered GOLDMAN SACHS' profits, because the bank earns more

rent the longer metal stays in its warehouses. However, companies that use aluminum argue that

the delays hurt them by making them wait for deliveries and can also raise the spot price of

aluminum because that price is calculated by a formula that includes a premium based on storage

costs. An official at MillerCoors told a Senate committee that the difficulty in getting metal

supplies had cost it and other companies $3 billion last year.

47.     In 2010 THE LONDON METAL EXCHANGE registered depots surge to an all-time high

of 6m tons – up from 1m in 2007.  Traders and Bankers say warehousing is a class "anti-

cyclical" business as it flourishes when demand for metals is lackluster and stockpiles mount.

THE LONDON METAL EXCHANGE DATA SUGGESTED THAT with so much metal in

depots, warehouses will earn rental fees for months to come.  Fees were poised to rise by about 5

per cent on average in April 2010. GOLDMAN SACHS and JP MORGAN knew they would be

paid a so-called "free-on-truck" fee when metal starts to move out of depots, increasing profits as

disclosed by THE LONDON METAL EXCHANGE.

48.     In or about February 2010, JP MORGAN CHASE & CO., purchased Defendant HENRY

BATH & SON LTD., metal warehousing giant and world leading logistics provider specializing

in the storage and shipping of exchange traded metals, as part of a deal to buy a large chunk of

the RBS Sempra Commodities business for $1.7 Billion dollars.  HENRY BATH & SON LTD.,

is the founding member of THE LONDON METAL EXCHANGE.

49.     Within 3 weeks of the JP MORGAN CHASE & Co., HENRY BATH & SON LTD.,

purchase, GOLDMAN SACHS purchased Defendant METRO INTERNATIONAL LLC, a

leading aluminum warehousing firm, deliberately stripped economic efficiency and intentionally

slowed down shipping times more than 20-fold, and gamed regulations requiring at least 3,000

tons be shipped out daily (originally instituted to prevent hoarding) by simply shuffling metal between warehouses.  There was no plausible procompetitive intent or goal by Defendants, only crass and greedy "rent seeking" (as the term is used in economics) through both horizontal and vertical integration in violation of state and federal antitrust laws.

50.    This apparent intentional vertical integration strategy of releasing as little aluminum as possible benefits GOLDMAN SACHS and JP MORGAN in a number of ways. For instance, as a warehouse operator, GOLDMAN SACHS extracts $165 million a year as rent from other actors who store metal.

51.    GOLDMAN SACHS and JP MORGAN CHASE, concomitantly created a horizontal and vertical integration strategy to collectively stockpile and hoard the all-time high registered depots surge knowing that they collectively would control the depots where 70% of THE LONDON METAL EXCHANGE stocks were being held, knowing that the rents received for storage would increase at exponential rates, the market price of aluminum would surge, and their speculation on the "market" price of aluminum would reap windfall profits as a result of their monopolistic control of the market.

52.    As a commodities trader, the drop in global supply allows the company to profit off rising prices. And as a speculator, GOLDMAN SACHS makes money betting on the direction of the aluminum spot price it's manipulating. Kevin Drum has aptly called it "a money spinning machine."

53.    Creating a global headache for manufacturers that need the raw material, some 70% of the world's aluminum inventory is caught up in these types of "bank deals." Metro's inventories alone have exploded from 50,000 tons in 2008 to 1.5 million tons today.   Thus, not only have Defendants attempted to monopolize, and have a dangerous probability of success, they have in

fact successfully monopolized the aluminum market nationally and globally, and created

unreasonable restraints of trade.

54.    Financial institutions have intentionally made a mockery of market logic, forcing end-

users to keep paying more despite rising global aluminum supplies. As the *Times* points out, each

time you "open a can of soda, beer or juice," GOLDMAN SACHS gets a cut.  Defendants'

invidious conduct created an exclusionary and anticompetitive vertical and horizontal

monopolization, with no procompetitive benefits.

55.    By inserting itself into a healthy industry producing widely needed commodities, severely

degrading functionality, and widely distributing costs while itself benefiting, GOLDMAN

SACHS and JP MORGAN couldn't fit a more archetypal description of a parasite on the

markets. Hoarding in aluminum, however, is just one in a bevy of ever-multiplying non-

innovations, demonstrating how the leeching of productive society has emerged as finance's

guiding light, and leeching that antitrust laws are designed to prohibit and make the economic

sanctions and repayment to consumers for entering such destructive enterprises too high to

pursue.

56.    Once this antitrust scheme was exposed, Defendants reversed themselves on July 31,

2013, to terminate some of the antitrust conduct of the Defendants.

## **CLASS REPRESENTATION ALLEGATIONS**

57.    Plaintiffs incorporate the foregoing paragraphs 1 through 55 as though fully set forth at

length herein.

58.    Plaintiffs bring this action pursuant to Federal Rule of Civil Procedure 23 on behalf of the

Proposed Class.

59.    Plaintiffs bring this action on behalf of a class consisting of:

13

All direct and indirect purchasers of aluminum from HENRY BATH, LLC, HENRY BATH & SON LTD., JP MORGAN CHASE & CO., THE LONDON METAL EXCHANGE, GOLDMAN SACHS, GLENCORE XSTRATA, and collusive cartel of collaborators, including businesses and residents and citizens of the State of Florida and nationally who purchased aluminum or aluminum products.

60.     Membership in the Proposed Class is so numerous as to make it impractical to bring all of the Proposed Class members before the Court.  The exact number and identity of the Proposed Class is unknown; however, Plaintiffs know that there are thousands of persons in the Proposed Class.  Plaintiffs are a member of the Proposed Class.

61.     Specifically excluded from the proposed Class are Defendants, any entities in which Defendants have a controlling interest, and the officers, directors, affiliates, legal representatives, successors, subsidiaries and/or assigns of Defendants, and the Court and Court personnel.

62.     This action may properly be maintained as a class action under Federal Rule of Civil Rule 23 because the action satisfies the numerosity, typicality, adequacy, predominance and superiority requirements of the Rule.

63.     There are numerous and substantial questions of law and fact common to the Proposed Class which control this litigation, and which predominate over any individual issues.  Included within the common questions are:

A.     Whether Defendants should be declared in violation of federal and state anti-trust and consumer protection laws and held financially responsible for individually notifying all class members of their illegal cartel and collusive scheme;

B.     Whether the Defendants violated state and federal anti-trust and consumer protection laws;

C.     Whether Defendants acted together to form an enterprise, and whether there was horizontal or vertical monopolization, or both;

D.     Whether the enterprise was engaged in or its activities had sufficient market power to affect interstate or foreign commerce;

E.     Whether each Defendant was associated by or with the enterprise;

14

F.      Whether each Defendant conducted or participated, directly or indirectly, in the conduct of the affairs of the enterprise;

G.      Whether each Defendant committed, or aided and abetted the commission of, at least two acts of anti-competitive monopolization and racketeering;

H.      Whether the collusive and cartel acts constitute a pattern of racketeering activity;

I.      Whether Plaintiffs purchased aluminum directly or indirectly from Defendants;

J.      Whether Defendants engaged in two or more acts of mail or wire fraud during the previous six years;

K.      Whether Defendants caused Plaintiffs and members of the class to sustain damages as a result of their anticompetitive scheme and conduct;

L.      Whether Defendants' actions or omissions with regard to the sale of aluminum issue violate Florida, federal and other states' anti-trust and consumer protection statutes;

M.       Whether Plaintiffs and the members of the proposed class are entitled to compensatory damages;

N.       Whether Plaintiffs and members of the proposed class are entitled to an award of reasonable attorneys' fees, prejudgment interest, post-judgment interest and costs of suit;

O.      Whether this suit will result in a public benefit;

P.      Whether Defendants violated federal antitrust laws under 15 U.S.C § 15;

Q.      Whether Defendants violated the Florida antitrust act under Chapter 542, Fla. Stat.;

R.      Whether the Defendants violated the Florida unfair and deceptive acts and practices under Fla. Stat. § 501.201 *et seq*;, and Fla. Stat. § 772.101 *et seq*;

S.       Whether Defendants violated 18 U.S.C. Section 1962 (c), Racketeer Influenced and Corrupt Organization Act;

T.      Whether Plaintiffs and the Proposed Class conferred non-gratuitous benefits on Defendants in the absence of a contract;

U.      Whether Defendants retained such non-gratuitous benefits from Plaintiffs;

V.      Whether Defendants' maintenance of such non-gratuitous benefits is unjust or inequitable;

W.      Whether Plaintiffs and the Proposed Class are entitled to damages, restitution, equitable relief and other relief; and

X.      The amount and nature of such relief to be awarded to Plaintiffs and the Proposed Class.

64.     The Plaintiffs and all Class Members seek damages and other relief, including but not limited to compensatory damages for economic losses, property damages, reimbursement of costs, litigation expenses, interest to the extent legally applicable, injunctive relief, attorneys' fees, and any other relief to which they may be entitled in law and/or equity including termination of their leases and/or rescission of their purchase agreements.

65.     The number of Class Members is so numerous that joinder of all members is impracticable. The Class consists of thousands of businesses and individual residents of Florida. The number of Class Members and the identity of the Class Members easily can be obtained through Defendants' records and aluminum purchases from the Defendants and from direct purchasers.

66.     Plaintiffs' claims are typical of the claims of the Proposed Class, and Plaintiffs have no interest adverse to the interests of the members of the Proposed Class. The Defendants have treated all of the Class Members the same, and all of the recalled vehicles possess similar defects.

67.     Plaintiffs will fairly and adequately protect the interests of the Proposed Class and have retained class action counsel experienced and competent in the prosecution of class actions and complex litigation for over 25 years who will diligently prosecute the litigation.  Plaintiffs are willing to appear at depositions, assist counsel in the prosecution of the action and subserve their own interests for those of the Class.  Plaintiffs will give complete support to the vigorous prosecution of the entire Proposed Class' claims.

68.     Adjudications with respect to individual members of the Proposed Class would, as a

practical matter, be dispositive of the interests of other members of the Proposed Class who are not parties to the adjudication and may impair and impede their ability to protect their interests.

69.     A class action is superior to other available methods for the fair and efficient adjudication of this controversy.  Absent a class action, the Proposed Class will continue to suffer damages and Defendants' violations of law will proceed without remedy.  Failure to certify the class likely will prevent consumers who are driving dangerous cars from pursuing their claims because of the expense of individual litigation. Individual litigation will be burdensome, time consuming, and repetitive.  A class action is superior to all other available methods to adjudicate this litigation.

70.     Additionally, common issues predominate over individual issues. The size of the class renders joinder impracticable. The class action device is preferable to individual litigation because it provides the benefits of unitary adjudication, economies of scale, and it provides access to the courts for hundreds of national and Florida residents and former residents who have purchased aluminum at inflated prices. Accordingly, class certification pursuant to Fed. R. Civ. P. 23 (b) (3) is desirable and appropriate.

71.     Class certification pursuant to Rule 23(b) (1) is appropriate because the prosecution of separate actions by individual members of the class would create the risk of inconsistent or varying adjudications with respect to individual members of the class. Individual litigation could result in some courts requiring Defendants to immediately pay damages, while other courts permit Defendants to continue to delay payment for economic harm, and continue the economic harm being perpetrated by Defendants. Defendants could not comply with differing sets of inconsistent orders.

72.     Most individual members of the Proposed Class have little ability to prosecute an individual action, due to the complexity of the issues involved in this litigation, the significant

17

costs attendant to litigation on this scale, and the comparatively small, although significant, damages suffered by individual members of the Proposed Class.

73.    This action will result in the orderly and expeditious administration of the Proposed Class members' claims, economies of time, effort and expense will be fostered, and uniformity of decisions will be ensured.

74.  Class Certification pursuant to Rule 23 (b) (2) is appropriate because Plaintiffs and all members of the proposed class seek the following declaratory and injunctive relief:

A.     Requiring Defendants to provide, or reimburse Plaintiffs and all members of the class for the increased cost of aluminum;

B.     Requiring Defendants to stop engaging in their collusion to create a cartel over aluminum delivery and storage;

C.     Enjoining Defendants from engaging in their cartel;

D.     Requiring Defendants to provide to the public and to class members individually, information about any other antitrust collusive plans over commodities;

E.     Declaring the right of Plaintiffs and members of the class to the immediate repayment of all amounts paid in excess of non-cartel market rates for aluminum and aluminum products;

<u>**COUNT I**</u>
**Consumer Protection**
**(Violations of Florida and Other State Antitrust and Consumer Protection Statutes)**

75.  Plaintiffs incorporate the foregoing paragraphs 1 through 74 as though fully set forth at length herein.

76.  Plaintiffs are consumers who purchased aluminum and aluminum products from Defendants.

77.  Defendants had a statutory duty to refrain from collusion to create a cartel and manipulate markets to increase the price of aluminum to Plaintiffs and the Proposed Class members.

78.  Defendants violated this duty by colluding to create a cartel;

18

79.  Plaintiffs who paid inflated aluminum prices as a result of Defendants' wrongful conduct or representation were directly and proximately injured by Defendants' conduct and would not have purchased aluminum at the inflated prices but for the illegal conduct of Defendants.

80.  Defendants' collusion and cartel harmed Plaintiffs and the class through unfair competition or unfair or deceptive acts or practices in violation of Fla. Stat. § 542 and § 501.201, *et seq.,* the common law, and other states' consumer protection laws.

81.  Defendants engaged in wrongful conduct while at the same time obtaining, under false pretenses, significant sums of money from Plaintiffs.

82.  As a proximate result of Defendants' misrepresentations, deceptive acts and omissions, Plaintiffs and the Proposed Class members have suffered ascertainable losses as a result of the paying inflated prices for aluminum from Defendants, and are entitled to relief, in an amount to be determined at trial.

83.  This lawsuit has been filed to assure that the public receives a benefit by, amongst other relief, enjoining further sales of aluminum at inflated prices, and by requiring Defendants to dismantle their collusive cartel which is the subject of this suit.

84.  Defendants' actions constitute unfair competition and/or unfair, unconscionable, deceptive or fraudulent acts in violation of various additional state antitrust and consumer protection statutes listed below:

a.      Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Ala. Code § 8 19 1, *et seq.*;

b.      Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Alaska Stat. Code § 40.50.471, *et seq.*;

c.      Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Ariz. Rev. Stat. § 44 1522, *et seq.*;

d.      Defendants have engaged in unfair competition or unfair or deceptive acts or practices in

violation of Ark. Code § 4 88 101, *et seq*.;

e.      Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Cal. Bus & Prof. Code § 17070, *et seq*.;

f.      Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Colo. Rev. Stat. § 6 1 105, *et seq*.;

g.      Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Conn. Gen. Stat. § 42 110b, *et seq.;*

h.      Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of 6 Del. Code § 2511, *et seq*.;

i.      Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of D.C. Code § 28 3901, *et seq*.;

j.      Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Ga. Stat. § 10 1 392, *et seq*.;

k.      Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Haw. Rev. Stat. § 480, *et seq*.;

l.      Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Idaho Code § 48 601, *et seq*.;

m.      Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of 815 ILCS § 505/1, *et seq*.;

n.      Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Ind. Code Ann. § 24 5 0.5.1, *et seq*.;

o.      Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Iowa Code § 714.1b, *et seq*.;

p.      Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Kan. Stat. § 50 623, *et seq*.;

q.      Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Ky. Rev. Stat. § 367.110, *et seq*.;

r.      Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of La. Rev. Stat. § 51:1401, La. Rev. Stat. § 51:121 *et seq*.;

s.      Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of 5 Me. Rev. Stat. § 207, *et seq*.;

t.      Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Md. Com. Law Code § 13 101, *et seq*.;

u.      Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Mass. Gen. L. Ch. 93A, *et seq*.;

v.      Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Mich. Stat. § 445.901, *et seq*.;

w.      Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Minn. Stat. § 325F.67, et seq.;

x.      Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Miss. Code Ann. § 75 24 1, *et seq*.;

y.      Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Vernon's Mo. Rev. Stat. § 407.010, *et seq*.;

z.      Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Mont. Code § 30 14 101, *et seq*.;

aa.     Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Neb. Rev. Stat. § 59 1601, *et seq*.;

bb.     Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Nev. Rev. Stat. § 598.0903, *et seq*.;

cc.     Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of N.H. Rev. Stat. § 358 A:1, *et seq*.;

dd.     Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of N.J. Stat. Ann. § 56:8 1, *et seq*.;

ee.     Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of N.M. Stat. Ann. § 57 12 1, *et seq*.;

ff.     Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of N.Y. Gen. Bus. Law § 349, *et seq*.;

gg.     Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of N.C. Gen. Stat. § 75 1.1, *et seq*.;

hh.     Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of N.D. Cent. Code § 51 15 01, *et seq*.;

ii.     Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Ohio Rev. Stat. § 1345.01, *et seq*.;

jj.     Defendants have engaged in unfair competition or unfair or deceptive acts or practices or representations in violation of Okla. Stat. tit. 15 § 751, *et seq*.;

kk.     Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Or. Rev. Stat. § 646.605, *et seq*.;

ll.     Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of 73 Pa. Stat. § 201 1, *et seq*.;

mm.     Defendants have engaged in unfair competition or unfair or deceptive     acts or practices in violation of R.I. Gen. Laws. § 6 13.1 1, *et seq*.;

nn.     Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of S.C. Code Laws § 39 5 10, *et seq*.;

oo.     Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of S.D. Code Laws § 37 24 1, *et seq*.;

pp.     Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Tenn. Code § 47 18 101, *et seq*.;

qq.     Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Tex. Bus. & Com. Code § 17.41, *et seq*.;

rr.     Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Utah Code Ann. § 13 1 1 1, *et seq*.;

ss.     Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Vt. Stat. Ann. tit. 9, § 245 1, *et seq*.;

tt.     Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Va. Code § 59.1 196, *et seq*.;

uu.     Defendants have engaged in unfair competition or unfair, deceptive acts or fraudulent acts or practices in violation of Wash. Rev. Code § 19.86.010, *et seq*.;

vv.     Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of W. Va. Code § 46A 6 101, *et seq*.;

ww.     Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Wis. Stat. § 100.20, *et seq*.; and

xx.     Defendants have engaged in unfair competition or unfair or deceptive acts or practices in

violation of Wyo. Stat. § 40 12 100, *et seq*.

85.  Plaintiffs and members of the Proposed Class were injured by Defendants' conduct, which created artificial increase in price for aluminum.

86.  As a direct and proximate result of Defendants' unfair methods of competition and unfair or deceptive acts or practices, Plaintiffs and the Proposed Class have suffered actual ascertainable economic loss by paying for aluminum at inflated prices.

87.  In the absence of Defendants' conduct, Plaintiffs would have purchased aluminum at significantly reduced cost.

88.  Plaintiffs and the Proposed Class members are entitled to actual damages, attorneys' fees and costs and such further relief as the Court deems just and proper.

## COUNT II
### Unlawful Exclusive Dealing and Other
### Exclusionary Agreements in Violation of Section 1 of the Sherman Act

89.  Plaintiffs incorporate the allegations of paragraphs 1 through 74 above.

90.   Defendants' collusion and cartel unreasonably restrict competition and thus *per se* violate Section 1 of the Sherman Act. These agreements unreasonably restrain trade and restrict the access to aluminum at market prices.

91.  Under the rule of reason, "the reasonableness of a restraint is evaluated based on its impact on competition as a whole within the relevant market." *Dickson v. Microsoft Corp.*, 309 F.3d 193, 205 (4th Cir. 2002).

92.  Justice Brandeis explained the rule of reason in *Chicago Bd. of Trade v. United States*:

"The true test of legality is whether the restraint imposed is such as merely regulates and perhaps thereby promotes competition or whether it is such as may suppress or even destroy competition. To determine that question the court must ordinarily consider the facts peculiar to the business to which the restraint is applied; its condition before and after the restraint was imposed; the nature of the restraint and its effect, actual or probable. The history of the restraint, the evil believed to

exist, the reason for adopting the particular remedy, the purpose or end sought to be attained, are all relevant facts. This is not because a good intention will save an otherwise objectionable regulation or the reverse; but because knowledge of intent may help the court to interpret facts and to predict consequences.

246 U.S. 231, 238 (1918).

93.   This analysis requires a showing of "anticompetitive effect" resulting from the challenged agreement. To have an "anticompetitive effect," conduct "must harm the competitive process and thereby harm consumers." *Microsoft*, 253 F.3d at 58. "[H]arm to one or many competitors will not suffice." Id. "The [Sherman Act] directs itself not against conduct which is competitive, even severely so, but against conduct which unfairly tends to destroy competition itself." *Id*.

94.   Defendants have engaged in destructive anticompetitive conduct harming all aluminum purchasers in the United States through increased prices and delays in the shipments and delivery of aluminum for the purpose of inflating prices to create more profit.

95.    The purpose and effect of these agreements are to restrain trade and competition in the aluminum commodity. These agreements violate Section 1 of the Sherman Act, 15 U.S.C. § 1.

## COUNT III
### Unlawful Essential Facilities Manipulation
### in Violation of Sections 1 and 2 of the Sherman Act

96.   Plaintiffs incorporate the allegations of paragraphs 1 through 74 above.

97.    Aluminum storage and distribution are distinct services and provided to serve markets.

98.   Defendants have committed exclusive essential facilities manipulation through its monopolistic control by denying competitors access its storage facilities and distribution of aluminum, in violation of Sections 1 and 2 of the Sherman Act, 15 U.S.C. § 1.

99.   Defendants' denial of access to essential facilities, and essential facilities manipulation prevented customers from having access to the aluminum commodity at market prices and inflating prices through limiting of supply by a scheme to delay deliveries of aluminum from

their storage facilities, thereby restraining competition in the aluminum commodities market.

<u>**COUNT IV**</u>
<u>**Monopolization of Aluminum Market in Violation of Section 2 of the Sherman Act**</u>

100. Plaintiffs incorporate the allegations in paragraphs 1 through 74 above.

101. Defendants possess monopoly power in the market for aluminum. Through the anticompetitive conduct described herein, Defendants have willfully maintained, and unless restrained by the Court will continue to willfully maintain, that power by anticompetitive and unreasonably exclusionary conduct. Defendants have acted with an intent illegally to maintain its monopoly power in the aluminum commodity market, and its illegal conduct has enabled it to do so, in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.

102. Defendants have both possession of monopoly power in a relevant market and demonstrated "the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident."

103. Defendants' possession of monopoly power in the relevant market has both **product** and **geographic** dimensions.

104. The relevant product market includes all products, the use of which is reasonably interchangeable.  Whether a product is reasonably interchangeable for another depends both on the ease and speed with which customers can substitute it and the desirability of doing so, and on the cross-elasticity of suppliers' production facilities.  The boundaries of a product market are determined by eliminating from the market all products that are not reasonably interchangeable substitutes for the product manufactured or sold by the Defendants.  *See R.D. Imports Ryno Indu. v. Mazda Distribs., 807* F. 2d 1222, 1225 (5th Cir. 1987); *See F.T.C. v. Whole Foods Mkt., Inc.,* 548 F. 3d 1028, 1037 (D.C. Cir. 2008); *Brown Shoe Co. v. United States*, 370 U.S. 294, 324 (1962)

105. The relevant geographic market is the area of effective competition in which the seller operated and to which the purchaser can practically turn for supplies.   The geographic market selected must both correspond to the commercial realities of the industry and be economically significant.

106. Defendants' possession of monopoly power in the relevant market has product dimensions as evidenced by GOLDMAN SACHSs purchase of Metro International whose warehouses in Detroit alone store more than 25% of the available aluminum on the market.  The aluminum commodity is not reasonably interchangeable as evidenced by the average wait time it took customers to receive their aluminum before and after the Defendants conduct took place.  In 2010, before Defendants took monopoly power over the aluminum market, consumers would receive their aluminum orders in 6 weeks.  Now the current wait is on average 10 times longer, or approximately 16 months as Defendants have control of 70% of the inventoried national aluminum market.

107. Defendants' possession of monopoly power in the relevant market has geographic dimensions as this power extends across the entire Nation.  Defendants hold a predominant share of the relevant aluminum market.  This is further evidenced by the facts that consumers are forced to wait 10 times longer than needed only 3 years ago, prior to the Defendants' acts in monopolizing the aluminum market, as there are no reasonable substitutes available.

## COUNT V
## Attempted Monopolization of the Aluminum Market in Violation of Section 2 of the Sherman Act

108. Plaintiffs incorporate the allegations of paragraphs 1 through 74 above.

109. "The traditional claim for attempted monopolization arises when the danger of monopolization is clear and present, but before a full blown monopolization has necessarily been

accomplished." *Alaska Airlines v. United States*, 948 F.2d 536, 541-42 (9th Cir. 1991). The elements of attempted monopolization are that the defendant (1) engaged in predatory or anticompetitive conduct, (2) with the specific intent to monopolize, and (3) with "a dangerous probability" of achieving monopoly power. *Spectrum Sports v. McQuillan*, 506 U.S. 447 (1993).

110. Defendants have limited storage and distribution of aluminum by other parties such that those with the potential to compete with or facilitate the development of storage and distribution of aluminum and thereby to erode Defendants monopoly.  Both direct and indirect purchasers of aluminum experienced increased costs in aluminum material which increased the cost of business due to Defendants' predatory anticompetitive conduct.  Defendants conduct was specifically intended and designed to allow Defendant to create and maintain dominance in the aluminum commodities industry and market.  Defendants conduct was anticompetitive as it did harm and continues to harm the competitive process thereby harming consumers.  Defendants can offer no rational business justification other than to drive the price of aluminum higher than the current market price, thereby increasing profits and rents received for storing and distributing aluminum.   Defendants have willfully engaged, and are engaging, in a course of conduct, including tying and unreasonably exclusionary agreements, in order to obtain a monopoly in the aluminum commodity market, and there is a dangerous probability that, unless restrained, it will succeed, in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2. Defendants have acted with a specific intent to monopolize, and to destroy effective competition in, the aluminum commodities market.

## COUNT VI
## Unjust Enrichment

85.     Plaintiffs incorporate the foregoing paragraphs 1 through 74 as though fully set forth at length herein.

86.      Defendants had knowledge of their collusive plan to cartelize the aluminum market.

87.      During the class period, Plaintiffs and Class Members conferred upon Defendants, without knowledge of the collusive cartelization of the aluminum market, payment at inflated prices, which are benefits that were clearly non-gratuitous.

88.      Defendants appreciated, accepted and retained the non-gratuitous benefits conferred by Plaintiffs and the Class Members despite their knowledge of their illegal conduct.  Retaining the non-gratuitous benefits conferred upon Defendants by Plaintiffs and the Class Members under these circumstances is unjust and inequitable.

89.      Defendants' retention of the non-gratuitous benefits conferred by Plaintiffs and the Class Members is unjust and inequitable, and Defendants should disgorge the payments they received from the Plaintiffs and the Plaintiff class, and pay restitution in the manner established by the Court, in addition to any other equitable remedy the Court may choose to impose.

## COUNT VII
## Federal Consumer Protection

90.      Plaintiffs incorporate the foregoing paragraphs 1 through 74 as though fully set forth at length herein.

91.      Defendants have violated federal consumer protection statutes.

111. Defendants had a duty to refrain from collusion to create a cartel and manipulate markets to increase the price of aluminum to Plaintiffs and the Proposed Class members.

86.      Defendants knowingly participated in collusion to create a cartel and manipulate markets to increase the price of aluminum to Plaintiffs and the Proposed Class members

87.      Plaintiffs and members of the Proposed Class were injured by Defendants' conduct, which created artificial increase in price for aluminum.

88.      As a direct and proximate result of Defendants' unfair methods of competition and unfair

28

or deceptive acts or practices, Plaintiffs and the Proposed Class have suffered actual

ascertainable economic loss by paying for aluminum at inflated prices.

89.     In the absence of Defendants' conduct, Plaintiffs would have purchased aluminum at

significantly reduced cost.

90.     Plaintiffs and the Proposed Class members are entitled to actual damages, attorneys' fees

and costs and such further relief as the Court deems just and proper.

**COUNT VIII**
**Violation of Racketeer Influenced and Corrupt Organization Act**
**18 U.S.C. SECTION 1962 (C)**

90.     Plaintiffs incorporate by reference paragraphs 1 through 74 as if fully rewritten herein.

91.     Defendants are and were at all times mentioned herein "persons" as that term is defined

in 18 U.S.C. § 1961(3).

92.     The Defendants constitute an association-in-fact "enterprise" as that term is defined in 18

U.S.C. § 1961(4), which is engaged in and affects interstate and foreign commence. This

enterprise at all times mentioned herein was and is engaged in public dissemination of

information regarding their aluminum storage and distribution services within the United States.

93.     Defendants knowingly and willfully conducted and participated in the conduct of the

enterprises' affairs, directly and indirectly, through a pattern of racketeering activity in violation

of 18 U.S.C. § 1962(c).

94.     Defendants' enterprise was engaged in and its activities affected interstate or foreign

commerce.

95.     Each Defendant was associated with the enterprise.

96.     The Defendants intended that the enterprises transmit this false and misleading

information to Plaintiffs and members of the class.

97.     Each Defendant, on behalf of the enterprise, transmitted false and misleading information to Plaintiffs and members of the class in the conduct of the enterprise's affairs.

98.     Each Defendant committed, or aided and abetted the commission of at least two acts of racketeering.

99.     As discussed throughout this Complaint, Defendants were aware of their monopolization of the aluminum market. Yet, Defendants as part of their scheme sought to use the enterprises to promote their profits from Plaintiffs and members of the class.

100.    Defendants represented in multiple mailings and telephone calls to the enterprise and its members, to the class members, and in communications with Federal and State officials. Defendants in their mailings and telephone calls omitted material information concerning their antitrust collusion and cartel.

101.    The Defendants intended that the enterprise transmit this false and misleading information to Plaintiffs and members of the class.

102.    The enterprises did transmit this false and misleading information to Plaintiffs and members of the class. Plaintiffs and members of the class relied on the false and misleading information when they made their decisions to purchase aluminum that form the subject matter of this litigation.

103.    The pattern of racketeering activity engaged in by Defendants involves schemes and artifices to defraud constituting mail fraud (U.S.C. § 1341) and wire fraud (18 U.S.C. § 1343), all of which is "racketeering activity" as defined in 18 U.S.C. § 1961(1) (B).  Defendants have engaged in these schemes and artifices with the specific intent to defraud over a number of years, causing damage to the property interests of Plaintiffs and to the members of the class.

104.    The pattern of racketeering engaged in by Defendants involves hundreds of predicate acts

constituting mail fraud and wire fraud, as previously set forth above. All of these acts are related to the pattern of racketeering and have taken place over many years, establishing both relatedness and continuity.

105.    As a proximate result of the pattern of racketeering engaged in by Defendants, Plaintiffs and members of the class suffered damage to their property, including overpayment for aluminum. Members of the class do not allege that this claim applies to any personal injuries that class members sustained because of Defendants' conduct. However, the claim does apply to economic damage caused.

**COUNT IX**
**Fraudulent Concealment**

106.    Plaintiffs incorporate by reference and restate paragraphs 1 through 74 as if fully rewritten herein.

107.    Defendants have known since 2010 of their conspiracy and collusion to create a cartel to control the storage and delivery of aluminum.

108.    Defendants intentionally concealed their collusion, and acted with reckless disregard for the truth.

**DEMAND FOR TRIAL BY JURY**

Plaintiffs demand trial by jury on all issues so triable.

DATED: August 2, 2013

Respectfully submitted,

*/s/ Tim Howard*

Tim Howard, J.D., Ph.D.
Florida Counsel for the Plaintiffs:
Florida Bar No.:  655325
Howard & Associates, P.A.
8511 Bull Headley Rd., Ste. 405

Tallahassee, FL 32312
(850) 298-4455
tim@howardjustice.com

Richard A. Daynard, Esq., Ph.D.
Of Counsel, Howard & Associates, P.A.
400 Huntington Avenue
Boston, MA 02115
r.daynard@neu.edu